Angus Realty v. Exxon Corporation     CV-92-304-B    08/11/93

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE


Angus Realty Corporation

v.                                    Civil No. 92-304-B

Exxon Corporation


**O R D E R**

In this diversity action, plaintiff Angus Realty Corporation ("Angus") seeks, among other things, specific performance of a contract under which defendant Exxon Corporation ("Exxon") was given an Option to purchase certain real property from Angus. The Complaint is in three Counts:  Count I alleges that Exxon terminated the contract without cause or justification; Count II claims that Exxon breached the contract by failing to appear in the New Hampshire Supreme Court to contest an appeal brought by an entity not a party to the contract; and Count III asserts that Exxon's termination was in bad faith.  Two motions are pending at this juncture:  Exxon's Motion for Summary Judgment and Angus' Cross-Motion for Summary Judgment on Count II.  For reasons discussed below, I grant Exxon's motion for summary judgment as

to Count II but deny the motion as to Counts I and III. Angus'
motion for summary judgment is also denied.

## I.  BACKGROUND

The facts relevant to the disposition of these motions are
as follows.  On March 8, 1991, Exxon entered into an Option to
purchase real property located in Salem, New Hampshire, from
Angus for the purpose of constructing a service station and
convenience store.  Kenny Aff. ¶ 2.[1]  The purchase price was

---

[1]Section one of the Option provides in pertinent part:

If the Zoning Approvals and the Permit Approvals are denied
or are not granted within one hundred eighty (180) days
after Exxon's exercise of the Option, or, if granted, the
Zoning Approvals or the Permit Approvals contain any
qualification or condition which is not acceptable to Exxon,
Exxon may at its election either:

    (a)   commence and prosecute appeals or other
          proceedings to contest such denial, qualification,
          or condition; or

    (b)   terminate this Contract by giving written notice
          of termination to Seller.

Seller shall cooperate with Exxon in obtaining the Zoning
Approvals and Permit Approvals, including executing
instruments reasonably requested by Exxon; assisting Exxon,
at Exxon's expense, in prosecuting such applications; and,
upon request by Exxon, appearing at administrative
proceedings in support of such applications.

$700,000. Kenny Aff. Ex. A at 1. On May 1, 1991, the Option was amended to extend the option period to November 1, 1991. Kenny Aff. Ex B at 1. Exxon wanted the extension because it did not have funds available in 1991 to pay for the property. Kenny Dep., Pl.'s Ex. C at 30-31.

During the permitting process, Maureen Masson, the president of Ganonoque Water Corporation ("Ganonoque") appeared at a June 1991 Salem Planning Board ("Board") hearing and stated that she was concerned that the proposed service station could contaminate Ganonoque's water system. Kenny Dep., Pl.'s Ex. C at 56. This was the first time that Exxon and Angus were made aware of Ganonoque's concerns. Yameen Aff., Pl.'s Ex. B ¶ 16; Kenny Dep., Pl.'s Ex. C at 56.[2] Four months later, Exxon exercised its option to purchase the property by giving written notice to Angus. Kenny Aff. Ex. C at 1.

---

This Contract and the obligations of Exxon hereunder shall be conditioned upon all Zoning Approvals, Permit Approvals, and Subdivision Approvals being validly and irrevocably granted without qualification or condition except such as may be acceptable to Exxon and no longer subject to appeal.

Kenny Aff. Ex. A at 2.

[2]Neither Ms. Masson nor Ganonoque were on the list of abutters. See Pl.'s Ex. H.

3

On November 14, 1991, the Board approved Exxon's site plan and issued the requisite approvals and permits on the following condition: Exxon was required to "[p]ost $155,000 bond to protect against contamination of Ganonaque [sic] Wells by Exxon . . . ." No one at Exxon expressed concern over the amount that was required. Kenny Dep., Pl.'s Ex. C at 58. However, on December 5, 1991, Ganonoque appealed the Board's approval to the Rockingham Superior Court. On January 7, 1992, the Superior Court denied the appeal. Three days later, Ganonoque moved for reconsideration, which was denied on January 27, 1992. Ganonoque then appealed to the New Hampshire Supreme Court. When Exxon failed to contest Ganonoque's notice of appeal, Angus moved to appear as amicus curiae and moved for summary affirmance on May 8, 1992. A month later, on June 2, 1992, the Court declined to accept Ganonoque's notice of appeal.

Angus claims that during the Ganonoque appeals, Exxon proposed that Angus retain the property, construct the station at Angus' expense, and either operate it or lease it to some other entity. Angus also contends that Ms. Masson stated in April 1991 that Ganonoque might be satisfied if it were connected to the town water line. Although Angus agreed to "either bond or place in escrow the necessary funds to assure the installation of the

4

town water line," Letter from Shaheen to Hekimian of 4/2/92, Pl.'s Ex. J at 1, it claims that Exxon failed to respond. Finally, Angus asserts that while it notified Exxon that the Town Attorney for Salem stated that "Exxon [could] seek and . . . receive a building permit from the Town so that [it could] commence construction," Letter from Shaheen to Hekimian of 3/26/92, Pl.'s Ex. K at 1, Exxon failed to even make an attempt to obtain the permit. In any event, on April 27, 1992, while the Ganonoque appeal was still pending, Exxon notified Angus in writing that it was terminating the Option.

## II. DISCUSSION

### A. Standard of Review

I assess the parties' motions according to the following principles. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477

5

U.S. 242, 250 (1986); accord Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). A "material" issue is one that "affect[s] the outcome of the suit . . . ." Anderson, 477 U.S. at 248. The burden is upon the moving party to aver the lack of a genuine, material factual issue, Finn v. Consolidated Rail Corp., 782 F.2d 13, 15 (1st Cir. 1986), and the court must view the record in the light most favorable to the non-movant, according the non-movant all beneficial inferences discernable from the evidence. Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988). If a motion for summary judgment is properly supported, the burden shifts to the non-movant to show that a genuine issue exists. Donovan v. Agnew, 712 F.2d 1509, 1516 (1st Cir. 1983).

B. Basic Tenets of New Hampshire Contract Law

The New Hampshire Supreme Court has repeatedly held that a contract should be interpreted to reflect the intention of the parties at the time it was made. Parkhurst v. Gibson, 133 N.H. 57, 61 (1990); R. Zoppo Co v. City of Dover, 124 N.H. 666, 671 (1984); Trombly v. Blue Cross/Blue Shield, 120 N.H. 764, 770 (1980). However, what matters in contract interpretation is "objective or external criteria rather than [the]. . . unmanifested states of mind of the parties." Tentindo v. Locke

6

Lake Colony Ass'n., 120 N.H. 593, 599 (1980); Kilroe v. Troast, 117 N.H. 598, 601 (1977).

The language of a contract must be the starting point in contract interpretation. Accordingly, extrinsic evidence will not be consulted to interpret a contract in the absence of fraud, duress, mutual mistake, or ambiguity. Parkhurst, 133 N.H. at 62; Miller v. Miller, 133 N.H. 587, 590 (1990); Logic Assoc., Inc. v. Time Share Corp., 124 N.H. 565, 572 (1984). In construing contract language, a court must consider the contract as a whole, viewed from the perspective of the parties at the time the contract was formed. R. Zoppo Co., 124 N.H. at 671. Moreover, contract language will be given its common meaning, Logic Assoc., Inc., 124 N.H. at 572, and will be construed from the perspective of a reasonable person. Gamble v. University of N.H., 136 N.H. 9, 13 (1992). The interpretation of an unambiguous contract presents a question of law for the court. See Gamble, 136 N.H. at 13.

If contract language is ambiguous, extrinsic sources may be consulted to determine the objective intent of the parties. See MacLeod v. Chalet Suisse Int.'l, Inc., 119 N.H. 238, 243 (1979). Contract language has been held to be ambiguous "when the contracting parties reasonably differ as to its meaning."

7

Laconia Rod & Gun Club v. Hartford Accident & Indem. Co., 123 N.H. 179, 182 (1983). Although the court must determine whether contract language is ambiguous, the interpretation of an ambiguous contract ordinarily will be left to the trier of fact.[3] Public Serv. Co. of N.H. v. Town of Seabrook, 133 N.H. 365, 370 (1990); MacLeod, 119 N.H. at 243; In re Navigation Technology Corp., 880 F.2d 1491, 1495 (1st Cir. 1989)(construing New Hampshire contract law).

With these basic principles in mind, I turn to the specific questions of contract interpretation presented by the parties' respective motions for summary judgment.

C.   Application

1.   Count I

Exxon relies upon two provisions in the contract to support its claim that it was authorized to terminate the Option contract. First, it cites a provision permitting termination 180

_____

[3]The only circumstance in which the meaning of ambiguous contract language may be determined by the court is if, after considering all of the evidence, including extrinsic evidence not considered in construing unambiguous contract language, a rational finder of fact could resolve the ambiguity in only one way. See Gamble, 136 N.H. at 15 (court determined the meaning of an ambiguous contract term where, upon all of the evidence, any other reading would lead to an unreasonable result).

days after Exxon agreed to purchase the property if the permit approvals "contain any qualification or condition which is not acceptable to Exxon. . . ." According to Exxon, the Ganonoque appeal was a qualification or condition on the permit approval entitling Exxon to terminate the contract because the appeal had not been resolved within 180 days of Exxon's agreement to purchase the property. Second, Exxon relies upon a provision providing that "the obligations of Exxon hereunder shall be conditioned upon all . . . Permit Approvals . . . being . . . no longer subject to appeal." Exxon imputes to this provision the 180-day limitation contained in the earlier provision and argues that it was authorized to terminate the contract because the appeal had not been resolved within 180 days. I find neither argument persuasive.

Exxon's argument that the Ganonoque appeal was a "qualification" or "condition" is easily addressed. Qualifications and conditions on permit approvals are limitations imposed by the permitting authority. Such terms cannot reasonably be read to include an appeal taken by a third party from an approval with no unacceptable conditions. Thus, I decline to accept this argument.

9

Exxon's second argument is more difficult. Although the Option unambiguously conditions Exxon's obligation to perform upon the resolution of all appeals, no time limit is expressly set by which appeals must be resolved in order for Exxon's obligations to become unconditional. Exxon reasonably argues that the 180-day limitation contained in an earlier paragraph in the same section also establishes the time by which all outstanding appeals must be resolved. However, this interpretation is not the only reasonable reading of the Option agreement. Another reasonable interpretation is that the 180-day limitation was intended to apply only to events described in the paragraph in which it is contained and no time limitation was to be applied to the exhaustion of appeals provision. Under this interpretation, if Exxon's application for site plan approval had been denied or if it had not been granted with satisfactory conditions within 180 days, Exxon would have been free to terminate the agreement. However, because a satisfactory approval was obtained within 180 days and the appeal was eventually resolved in Exxon's favor, Exxon remained obligated to perform under the Option agreement.

10

The latter interpretation is a reasonable reading of the contract for several reasons. First, if Exxon had intended to make the resolution of appeals subject to the 180-day time limit, it could have simply and unambiguously done so. The fact that Exxon chose to place the exhaustion of appeals condition in a paragraph not containing the 180-day limitation suggests that Exxon did not intend that the exhaustion of appeals requirement would be subject to the 180-day limitation.

Second, unlike the interpretation proposed by Exxon, Angus' interpretation is reasonable because it would not place Angus at Exxon's mercy simply because an abutter took an unfounded appeal. It is virtually impossible in New Hampshire to obtain site plan approval and resolve an appeal taken by an abutter within 180 days. See, e.g., N.H. Rev. Stat. Ann. § 676:4 (allowing the planning board 90 days to approve or disprove an application for site plan approval with the possibility of additional extensions); N.H. Rev. Stat. Ann. § 677:15 (allowing an aggrieved party 30 days to appeal from a planning board decision); New Hampshire Supreme Court Rule 7 (granting a party aggrieved from a decision of the Superior Court 30 days from the clerk's written notice of decision to file a notice of appeal); New Hampshire Supreme Court Rule 22 (allowing an unsuccessful appellant 10 days

11

from the date of the Court's opinion in which to seek reconsideration). Accordingly, if the contract were interpreted to permit Exxon to terminate the Option if an appeal was still pending 180 days after the Option agreement was signed, it would vest Exxon with the broad discretion to terminate the contract in virtually all cases where an appeal was taken from the approval of a site plan application. Such an interpretation is inconsistent with the accepted rule of statutory construction that the court will construe a contract whenever possible so as not to place one party at the mercy of the other. Gamble, 136 N.H. at 14.

Finally, there are valid reasons why Exxon might reserve the right to terminate the contract if site plan approval was not obtained after 180 days, but agree to remain obligated under the contract until any appeal taken from a timely approval was resolved. When Exxon signed the Option agreement, it presumably was aware that a site plan approval could not be overturned on appeal unless a court determined that the planning board acted unreasonably or unlawfully. N.H. Rev. Stat. Ann. § 677:15. Under such circumstances, Exxon might justifiably have had a high degree of confidence that it would eventually be able to build at the site once it obtained site plan approval. Thus, Exxon might

12

have been willing to agree to wait for the resolution of an appeal if it obtained site plan approval from the planning board. Moreover, Exxon might well have believed that such a concession was necessary to obtain a commitment from Angus, since it is unlikely that Angus would have knowingly signed an Option that vested Exxon with broad discretion to terminate the contract simply because an abutter appealed from a decision of the planning board.

Because the exhaustion of appeals provision is reasonably susceptible to more than one meaning, I determine that the provision is ambiguous.[4] The resolution of this ambiguity will have to await trial since New Hampshire law dictates that the choice between two reasonable interpretations of a contract must be left to the trier of fact.

## 2. Count II

Exxon argues that the Option agreement did not obligate it to defend any appeals taken by abutters from Exxon's site plan approval. Angus responds that the Option required Exxon to apply

---

[4]Since I find that the contract is ambiguous for the above-stated reasons, I need not address Angus' argument that the contract is ambiguous because it does not address the possibility that an appeal would be taken by a third party such as Ganonoque.

for site plan approval, and this obligation includes an implied duty to defend the approval on appeal. Angus also argues that since the Option agreement obligates Angus to assist Exxon, at Exxon's expense, in obtaining the permits and approvals, Exxon is impliedly obligated to defend all appeals. I agree with Exxon that the unambiguous language of the Option agreement does not require Exxon to defend all appeals. Accordingly, I deny Angus' motion for summary judgment and grant Exxon's motion as to Count II.[5]

### 3. Count III

Exxon has not persuaded me that it is entitled to summary judgment with respect to Angus' claim that Exxon breached its duty of good faith and fair dealing. A genuine factual dispute exists as to whether Exxon improperly declined Angus' offer to take steps that would have promptly resulted in the successful resolution of the Ganonoque appeal. This evidence, coupled with the other evidence produced by Angus in opposition to Exxon's motion for summary judgment, requires that the resolution of Angus' good faith and fair dealing claim be left to the finder of

---

[5]I take no position on whether Exxon was obligated by its duty of good faith and fair dealing to defend the Ganonoque appeal to a conclusion.

14

fact.  Accordingly, Exxon's motion for summary judgment as to Count III is denied.

### III.  <u>CONCLUSION</u>

Exxon's Motion for Summary Judgment (document no. 6) is granted with respect to Count II and denied with respect to Counts I and III.  Angus' Cross-Motion for Summary Judgment on Count II (document no. 12) is denied.


SO ORDERED.


_____
Paul Barbadoro
United States District Judge

August 11, 1993


cc:  Martha Gordon, Esq.
     Peter Callaghan, Esq.